UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

_____

WILLIAM J. EINHORN,[1]                          :
as administrator of the                         :
Teamsters Trust Fund of Philadelphia & Vicinity, :
                                                :
                    Plaintiff,                  :
            v.                                  :         No. 5:14-cv-06924
                                                :
SUSAN MCCAFFERTY;                               :
DEBORAH MCCAFFERTY;                             :
                                                :
                    Defendants.                 :
_____

**<u>MEMORANDUM OPINION</u>**

| | |
|---|---|
| **Plaintiff's Motion to Dismiss the Counterclaim:** | **Granted**[2] |
| **Susan McCafferty's Motions for Summary Judgment:** | **Granted in Part, Denied in Part** |
| **Deborah McCafferty's Motion for Summary Judgment:** | **Granted in Part, Denied in Part** |

**Joseph F. Leeson, Jr.**                                           **March  31, 2016**
**United States District Judge**

## I.        Introduction

On March 9, 2013, Kevin McCafferty died at the age of 54.[3] He was a participant in the

Teamsters Pension Plan of Philadelphia and Vicinity, but he had not yet reached the minimum

age to begin receiving benefits. At the time of his death, Kevin was married to Susan

McCafferty; she is currently receiving benefits from the Plan in the form of a pre-retirement

surviving spouse benefit that commenced on the first day of April 2013. Kevin and Susan were

married for less than a year when Kevin died, which means that, under the terms of the Plan,

---

[1]        After this action was filed, Adam H. Garner replaced Einhorn as the plan administrator. <u>See</u> Order, Dec. 7, 2015, ECF No. 27.

[2]        Defendant Deborah McCafferty did not serve any response in opposition to this motion, and the motion is therefore granted as uncontested. <u>See</u> E.D. Pa. Local R. Civ. P. 7.1(c).

[3]        This matter is before the Court upon the cross-motions of Defendants Susan McCafferty and Deborah McCafferty for summary judgment, but the parties have stipulated to the pertinent facts and seek only a determination of the implications of those facts under federal law. <u>See</u> Stipulation of Facts, ECF No. 14.

Susan is entitled to a benefit of only sixty monthly payments, rather than a lifetime annuity.[4] See 29 U.S.C. § 1055(e), (f).

Susan was Kevin's second spouse. He was previously married to Deborah McCafferty, but they divorced in 2005 after twenty-two years of marriage. As part of their divorce proceedings, Kevin and Deborah reached an agreement on the division of their marital assets, which they memorialized in a document entitled "Division of property jointly owned by Kevin and Deborah McCafferty." The divorce decree they obtained in Pennsylvania state court incorporated this agreement by reference. Among other things, the agreement states, "Kevin agrees that when the divorce papers are completed, Deborah is entitled to half of his work pension."[5] Deborah, however, is not currently receiving any benefits from the Plan.

The problem for Deborah stems from a provision of the Employee Retirement Income Security Act of 1974 ("ERISA"). Under ERISA, a participant in a covered pension cannot alienate any part of his or her interest in the pension except through a device known as a "qualified domestic relations order" or "QDRO." See id. § 1056(d)(1), (3). After Kevin died, Deborah's attorney contacted the Plan to inform it that, pursuant to the divorce decree between her and Kevin, she was to receive one half of the value of Kevin's pension. The Plan responded that it had not received a QDRO to that effect, which meant that she was not entitled to any portion of Kevin's pension.

A series of questions bear on whether Deborah can secure any benefits from the Plan. First, what type of interest in Kevin's pension does the divorce decree purport to give Deborah? Second, does the divorce decree satisfy the requirements of ERISA to allow Deborah to rely on

---

[4]       See id. Ex. B § VII(C), ECF No. 14-1. Exhibit B to the Stipulation of Facts contains a copy of the "Summary Plan Description" for the Teamsters Pension Plan of Philadelphia and Vicinity, which is a simplified summary of the official Pension Plan and Trust Agreement. The parties have not supplied a copy of the official text.
[5]       Id. Ex. A ¶ 5.

that decree to secure whatever interest she may have? Third, if the decree does not meet ERISA's requirements, could Deborah seek an amended order in state court and rely on that order to secure her interest? Finally, does the fact that Susan is already receiving benefits from the Plan affect Deborah's ability to vindicate any interest she may have?

The answers to these questions compel the conclusion that Deborah has an enforceable, separate interest in fifty percent of Kevin's pension, but whether that interest survived Kevin's death depends upon the terms of the Plan, which is a question that the Plan administrator must answer. Deborah cannot obtain an interest in the survivor annuity that Susan is currently receiving, which means that if Deborah's separate interest was extinguished by Kevin's death, she is not entitled to any benefits.

## I. The divorce decree granted Deborah a separate interest in Kevin's pension but likely did not grant her surviving spouse rights.

The separation agreement provided that "Deborah is entitled to half of [Kevin's] work pension." There are generally two approaches to dividing pension benefits between spouses. See Samaroo v. Samaroo, 193 F.3d 185, 187 n.2 (3d Cir. 1999). One, called the "shared payment" approach, divides the pension benefits by "'split[ting]' the actual benefit payments made with respect to a participant under the plan to give the alternate payee part of each payment." U.S. Dep't of Labor, Emp. Benefits Sec. Admin., QDROs: The Division of Retirement Benefits through Qualified Domestic Relations Orders 29 (2014), http://www.dol.gov/ebsa/pdf/qdros.pdf [hereinafter QDROs]; Samaroo, 193 F.3d at 187 n.2. Under that approach, the beneficiary does "not receive any payments unless the participant receives a payment or is already in pay status." QDROs, supra, at 30. This approach was at work in Samaroo, where a divorce decree provided, "Husband has a vested pension having a present value, if husband were to retire at this time, of

$1,358.59 per month. At the time of husband's retirement and receipt of his pension he agrees to pay to wife one half of said monthly amount." See 193 F.3d at 187.

The alternative, called the "separate interest" approach, "divide[s] the participant's retirement benefit (rather than just the payments) into two separate portions with the intent of giving the alternate payee a separate right to receive a portion of the retirement benefit to be paid at a time and in a form different from that chosen by the participant." QDROs, supra, at 30. An example of this approach can be found in Files v. ExxonMobil Pension Plan, 428 F.3d 478 (3d Cir. 2005), where a property settlement agreement provided, "The Husband is the owner of an Exxon pension . . . . The wife shall be entitled to one-half of the Exxon pension." Id. at 480. As the court found, this language revealed the husband was "conveying to her a portion of . . . [husband's] interest in the Plan," rather than just an interest in sharing in any benefit payments that her husband received. Id. at 488 (alternations in original) (quoting Samaroo, 193 F.3d at 187 n.2).

Here, as in Files, the language of the settlement agreement reveals that Kevin intended to afford Deborah a separate interest in fifty percent of his pension, rather than a mere interest in sharing a portion of any benefit payments that he later received. This is a critical difference, because under the shared payment approach, the former spouse receives nothing if the participant does not receive any payments (there would be no payments to split). Kevin died before he began receiving retirement benefits, which means that if Deborah had been given only a shared payment interest, she would not have been entitled to any benefits. But under the separate interest approach, "because the spouses' benefits are independent, neither spouse's benefits stop upon the death of the other." See 2 Brett R. Turner, Equitable Distribution of Property § 6.34 (3d ed.), Westlaw (database updated Nov. 2015) (emphasis omitted).

However, there may be a problem for Deborah. At the time of Kevin's death, he had not yet reached the minimum age to be eligible to start receiving benefits from the Plan. While a person who is afforded a separate interest in someone else's pension plan is treated like a plan participant in his or her own right, that person nonetheless "cannot . . . receive a benefit earlier than the date on which the participant reaches his or her 'earliest retirement age,' unless the plan permits payments at an earlier date." QDROs, supra, at 40. Under the terms of some pension plans, this means that if the participant dies before reaching the minimum retirement age, any person who holds a separate interest in the participant's plan loses that interest. See Raymond S. Dietrich, Qualified Domestic Relations Orders § 10.04[1], Lexis (2015).

Other pension plans are different. They apply the so-called totally severed approach, which means that when a participant gives another person a separate interest in his or her pension plan, the plan completely separates the two interests, leaving the participant and the beneficiary as two autonomous plan participants. Under these plans,

> an alternate payee [can] begin receiving her entitlement when the plan participant reaches retirement age, whether the participant actually retires or continues working. If the plan participant dies before retirement, the alternate payee may begin receiving benefits when the participant would have reached retirement age; the participant's death, whether it occurs before or after the participant reaches retirement age, therefore does not affect the alternate payee's entitlement.

Krushensky v. Farinas, 189 P.3d 1056, 1062 (Alaska 2008) (citing David Clayton Carrad, The Complete QDRO Handbook 70 (2d ed. 2004)); see Dietrich, supra, § 10.04[1]. This approach fully protects a former spouse who holds a separate interest in a pension against the risk of the participant dying before reaching the minimum retirement age.

The parties have not provided a copy of the official text of the Pension Plan and Trust Agreement that governs Kevin's pension. Instead, they have provided only a "Summary Plan Description" that contains a simplified overview of the official Agreement, and the Summary

does not appear to specify whether or not the Plan applies a "totally severed approach" to separate interests, so it is unclear whether Deborah may have lost her separate interest when Kevin died before reaching the minimum retirement age. Regardless, because the answer to that question would require an interpretation of the terms of the Plan to determine whether Deborah has a valid claim for benefits, the Plan administrator must be permitted the first opportunity to make that determination. See Harrow v. Prudential Ins. Co. of Am., 279 F.3d 244, 254 (3d Cir. 2002); Zipf v. Am. Tel. & Tel. Co., 799 F.2d 889, 894 (3d Cir. 1986).

If it turns out that the Plan does not apply the totally severed approach, Deborah's separate interest was likely extinguished. If that is so, the only way that she could obtain any benefits from the Plan is if she is the holder of another type of interest: the right to be deemed Kevin's "surviving spouse." Pension plans governed by ERISA must provide a "qualified preretirement survivor annuity" to the surviving spouse of a vested participant who dies before their pension benefits commence, provided that the two were married for at least one year. 29 U.S.C. § 1055(a)(2), (f). Kevin's pension plan goes a step further by also offering a limited annuity to a surviving spouse who was married to a plan participant for less than one year at the time of the participant's death.[6] That, as previously mentioned, is the benefit that Susan is currently receiving. While that benefit is normally for the spouse to whom the plan participant was married at the time of death, a participant can assign that interest to a former spouse, provided, as with the alienation of any pension benefit under ERISA, that the interest is transferred through a QDRO. See id. § 1056(d)(3)(F); Samaroo, 193 F.3d at 191. By securing the right to be treated as the "surviving spouse," a spouse who holds a separate interest in a former spouse's pension (that does not follow the "totally severed approach") can protect the risk of

---

[6]     Stipulation of Facts Ex. B § VII(C).

losing that interest in the event the former spouse dies before reaching the minimum retirement age. See Dietrich, supra, § 10.04[1].

The question that must be answered then is whether Kevin and Deborah intended for Deborah to be treated as Kevin's surviving spouse, such that she, rather than Susan, should be entitled to his preretirement survivor annuity. The divorce decree and the settlement agreement are both silent as to survivorship rights in Kevin's pension, and "[t]he cases are divided on whether an order which divides retirement benefits in general can be construed to divide survivor benefits." Turner, supra, § 6:46. The majority of cases, however, hold that "any order which divides retirement benefits without accounting for survivor benefits" does not confer surviving spouse status upon a former spouse. Id. Under that view, Deborah would not possess the right to be treated as Kevin's surviving spouse, because both the settlement agreement and the divorce decree were silent on the question of survivorship rights. Only if Deborah could persuade a Pennsylvania state court to amend the divorce decree to provide her with that right would she be entitled to surviving spouse benefits from the pension. See Samaroo, 193 F.3d at 187-89 (discussing a surviving spouse's success in petitioning a state court to amend an existing divorce decree to afford her surviving spouse rights); Turner, supra, § 6:46 ("If the court is unwilling to conclude that language dividing retirement benefits divides survivor benefits, the spouse seeking to divide survivor benefits can still ask the court to reform the original language to correct a mutual mistake. Obviously, the moving spouse must prove that both parties actually intended that survivor benefits be divided.").[7]

---

[7]     Samaroo suggested, in dicta, that when a spouse is granted a separate interest in a pension, as opposed to an interest in sharing benefit payments, that may weigh in favor of finding that the pension-holder intended to also confer upon the former spouse the right to be treated as the surviving spouse. See 193 F.3d at 187 n.2. But whether that is a sensible interpretation of the parties' intent depends in large part on whether the pension plan in question follows the totally severed interest approach. As the Supreme Court of Alaska recognized in Krushensky, bestowing a qualified preretirement survivor annuity on a former spouse who holds a separate interest in a plan that follows the totally severed interest approach would be "unusual" and likely conflict with the spouses' reasonable expectations.

Whether Deborah should be treated as Kevin's surviving spouse does not matter if the Plan instead follows the totally severed approach, because that would mean that her separate interest was not extinguished by Kevin's death. See Krushensky, 189 P.3d at 1062-63. Indeed, if Deborah's separate interest survived Kevin's death, affording her the additional right to receive the survivor annuity would likely give her "substantially more than the parties bargained for," because she could simultaneously collect both the ordinary pension payments from her separate interest in the pension as well as payments from the survivor annuity, which would come from Kevin's half of the pension. Id. at 1063.

At this juncture, the following can be said: The divorce decree awarded Deborah a separate interest in Kevin's pension, which may have survived Kevin's death, depending upon whether the Plan follows the totally severed approach. If her separate interest did not survive, Deborah's only recourse would be to the Plan's qualified preretirement survivor annuity, which Susan is currently receiving. However, because the divorce decree did not explicitly give Deborah the right to be treated as the surviving spouse, she likely does not possess that interest (absent a state court amending the divorce decree to award that right to her).

## II.    The divorce decree qualifies as a QDRO under ERISA, which permits Deborah to enforce her separate interest, but is not sufficiently specific to allow Deborah to enforce a surviving spouse interest.

The next question that must be answered is whether the divorce decree qualifies as a QDRO, because a person can enforce an interest in a pension—whatever that interest may be— only if the right to that interest is embodied in a QDRO.[8] As the term suggests, a QDRO is

---

See 189 P.3d at 1063. The construction of the divorce decree is a matter of state law, and the Pennsylvania courts do not appear to have addressed this question.

[8]       Whether a state domestic relations order qualifies as a QDRO "are questions of statutory construction over which reviewing courts exercise de novo review." Files, 428 F.3d at 486. It is not clear from the Stipulation of Facts whether the Plan was furnished with a copy of the divorce decree and whether the Plan made a determination of whether the decree qualifies as a QDRO. Regardless, this Court would be required to make that determination anew.

simply any state domestic relations order[9] that is "qualified." To be a "qualified" domestic

relations order, the state order must meet certain criteria set forth under ERISA. Among other

requirements, the order must "clearly specif[y]" the following information:

> (i) the name and last known mailing address (if any) of the participant and the
> name and mailing address of each alternate payee covered by the order, (ii) the
> amount or percentage of the participant's benefits to be paid by the plan to each
> such alternate payee, or the manner in which such amount or percentage is to be
> determined, (iii) the number of payments or period to which such order applies,
> and (iv) each plan to which such order applies.

29 U.S.C. § 1056(d)(3)(C). These requirements serve "to reduce the expense of ERISA plans by

sparing plan administrators the grief they experience when because of uncertainty concerning the

identity of the beneficiary they pay the wrong person, or arguably the wrong person, and are sued

by a rival claimant." Metro. Life Ins. Co. v. Wheaton, 42 F.3d 1080, 1084 (7th Cir. 1994).

The settlement agreement incorporated into the divorce decree satisfies these criteria. It

includes the names of both Kevin and Deborah, specifies the percentage of Deborah's interest in

the pension (namely, fifty percent), and while the agreement does not mention the pension plan

by name, it refers to Kevin's "work pension," which makes clear that the plan in question is

Kevin's Teamsters Pension Plan. The statute requires that an order "clearly specif[y]" the plan; it

does not require that the QDRO specify the plan by name. See id. (finding that a reference in a

divorce decree to "the life insurance which is presently carried through [the spouse's] employer"

was sufficient to permit the identification of the plan "without significant ambiguity").

The agreement also contains sufficient information to clearly specify a mailing address

for both Kevin and Deborah. The agreement makes reference to two parcels of real property that

---

See Stipulation of Facts ¶ 13 (stating that the Fund denied Deborah's request for benefits "on the basis that there was no Qualified Domestic Relations Order on file" (emphasis added)).

[9]    ERISA defines a "domestic relations order" as "any judgment, decree, or order (including approval of a property settlement agreement) which . . . relates to the provision of child support, alimony payments, or marital property rights to a spouse, former spouse, child, or other dependent of a participant, and . . . is made pursuant to a State domestic relations law (including a community property law)." 29 U.S.C. § 1056(d)(3)(B)(ii).

Kevin and Deborah jointly owned. One, which appears to have been their marital home, was allocated to Kevin.[10] The other was allocated to Deborah. The agreement explains that Kevin and Deborah purchased this property to provide a home for Deborah's parents, who paid rent to Kevin and Deborah and were named one-percent owners on the deed. The agreement does not reveal whether Deborah's parents still resided there at the time of the divorce or whether Deborah planned to reside there herself, but the address of a residential property owned by Deborah,[11] and possibly occupied by her parents, is sufficient to constitute a mailing address for her.[12] See Stewart v. Thorpe Holding Co. Profit Sharing Plan, 207 F.3d 1143, 1151 (9th Cir. 2000) (finding a reference in a marital dissolution order to the address of a family residence that was awarded to one of the divorcing spouses to meet this requirement, despite the fact that the order did not "formally declare the family residence's address as [the spouse's] current mailing address").

Finally, because the divorce decree grants Deborah a separate interest in the pension, the decree necessarily specifies the "number of payments or period" to which her interest applies. The defining feature of a separate interest in a pension plan is that the plan administrator "treats each spouse as an independent participant under the plan," which means that "[e]ach spouse can determine independently the date on which his or her benefits will start." Turner, supra, § 6:34. Unlike a grant of a shared payment interest in another's pension, which may only give the beneficiary the right to share in a certain number of benefit payments or the right to share benefit payments for a certain period of time, the number of payments or period to which Deborah is

---

[10]    See Stipulation of Facts Ex. A ¶¶ 1, 4.

[11]    Because Deborah's parents may still own one percent of the home, Deborah owns at least ninety-nine percent of it.

[12]    A number of courts have found that this requirement can even be satisfied simply by the presence of the address of the party's attorney. See Stewart, 207 F.3d at 1151. This Court expresses no opinion on the merits of that view, other than to observe that, because the attorney-client relationship is "a quintessential principal-agent relationship," Comm'r v. Banks, 543 U.S. 426, 436 (2005) (citing Restatement (Second) of Agency § 1, cmt. e (Am. Law Inst. 1957)), it is not without reason.

entitled is inherent in her right to be treated as an independent plan participant.[13] Accordingly, the divorce decree qualifies as a QDRO with respect to Deborah's separate interest in the pension.

However, the divorce decree does not meet the statutory requirements necessary to allow Deborah to be treated as Kevin's surviving spouse (if she was awarded that right, which, as the Court has already observed, is unlikely). To give a former spouse the right to be treated as a pension participant's surviving spouse, the domestic relations order must meet not only the standard QDRO specificity requirements, but the order must also "<u>specifically</u> assign surviving spouse rights" to the former spouse. <u>Hamilton v. Wash. State Plumbing & Pipefitting Indus. Pension Plan</u>, 433 F.3d 1091, 1099 & n.9 (9th Cir. 2006); <u>see Samaroo</u>, 193 F.3d at 187 n.2; <u>see also Files</u>, 428 F.3d at 487 ("Not surprisingly, the [plan administrator] denied the ex-wife's claim for the pre-retirement survivor annuity on the grounds that the DRO did not mention her entitlement to such rights . . . ."). This requirement derives from a part of ERISA that provides that a former spouse can be treated as a surviving spouse only "[t]o the extent provided in [a] qualified domestic relations order." <u>See</u> 29 U.S.C. § 1056(d)(3)(F). To convey surviving spouse rights to a former spouse, a domestic relations order must therefore clear two "separate hurdles.

---

[13]    The Department of Labor expresses the view, in a booklet prepared "to provide general guidance about QDROs," that if a separate interest QDRO intends to afford the interest holder the rights of a plan participant, the QDRO must specify that "the alternate payee [has] the right that the participant would have had under the plan to elect the form of benefit payment and the time at which the separate interest will be paid." <u>QDROs</u>, <u>supra</u>, at 31. Because that right is inherent in the very concept of a separate interest in another person's pension, it should not be necessary to reiterate that feature in order to clearly specify the time at which the recipient can begin receiving benefits. A grantor could restrict that right by specifying a particular time when the beneficiary will receive the separate interest, <u>see id.</u> at 40, and if a grantor so chooses, then it would be necessary to make reference to that limitation in the QDRO. But when a grantor does not intend to restrict the ordinary rights of a separate interest holder, making an additional, explicit reference to the "number of payments or period" simply to track the statutory language is not necessary to meet the statute's clarity requirement. <u>See Hawkins v. Comm'r</u>, 86 F.3d 982, 991 (10th Cir. 1996) (citing <u>Wheaton</u>, 42 F.3d at 1085) (recognizing that a state order does not fail to meet the specificity requirements of § 1056(d)(3)(C) simply because the order "failed to track the language of the statute," provided that "the criteria of the statute were satisfied in substance").

The first hurdle is [ERISA's] specificity requirements, which apply no matter what type of pension right is being assigned in a [domestic relations order]. But if parties to [the] order seek to assign surviving spouse rights, then the second hurdle—§ 1056(d)(3)(F)—comes into play." Hamilton, 433 F.3d at 1099 n.9. Neither the divorce decree nor the settlement agreement incorporated into the decree mention surviving spouse rights. This means that even if the divorce decree can be interpreted to award Deborah those rights (without having mentioned them by name), and even if the divorce decree otherwise qualifies as a QDRO—which the Court finds it does—the decree nonetheless is not sufficient under ERISA to give Deborah the ability to enforce any surviving spouse rights she may have, because the decree does not make explicit reference to surviving spouse rights.

In theory, if Deborah could persuade a state court that Kevin intended to award her surviving spouse rights, the court could issue a new order that explicitly assigns those rights to her in order to satisfy ERISA's requirements. But under the law of this circuit, such an order would fail to qualify as a QDRO. In Samaroo, a former spouse who was awarded a shared payment interest in her former husband's pension sought to be treated as the husband's surviving spouse after the husband's death so that she could collect the qualified preretirement survivor annuity. 193 F.3d at 186. There, as here, it was unclear whether the original divorce decree afforded her that right because the decree was silent on the topic of surviving spouse rights. See id. at 187 n.2. However, the former spouse was able to obtain a posthumous state court order that explicitly awarded that right to her. Id. at 188. Despite her efforts, the court held that the posthumous order could not qualify as a QDRO under ERISA. The order's flaw was not that it failed to meet the specificity requirement, but rather that it violated another ERISA provision. Under the statute, a state order cannot be deemed a QDRO if the order "require[s] a plan to

provide increased benefits." See 29 U.S.C. § 1056(d)(3)(D)(ii). On the day that the former

husband died, there was no valid QDRO in place that gave the former spouse the right to be

treated as the surviving spouse, which meant that any surviving spouse benefits lapsed that day.

See Samaroo, 193 F.3d at 190. The posthumous order that the former spouse obtained was, in

effect, an attempt to resurrect benefits that had ceased to exist, see id. at 187, which would have

required the plan to provide increased benefits in violation of ERISA, see id. at 190.

Accordingly, the court held that a former spouse cannot obtain surviving spouse benefits if a

valid QDRO conveying those benefits does not exist on the date of the participant's death.[14]

---

[14]       This reasoning could suggest that no posthumous state court order could ever be qualified as a QDRO,
regardless of whether the interest sought relates to surviving spouse benefits or any other type of benefit, because
any interest not secured by a QDRO lapses with the participant's death and cannot be resurrected. See 193 F.3d at
193 (Mansmann, J., dissenting) ("Today the majority holds, in effect, that a state court's power to enter or modify a
[QDRO] with respect to a participant's interest in a pension plan ends with the participant's death."). Samaroo,
however, expressly limited its reach to the facts before it, 193 F.3d at 190 n.3, and six years later, the Third Circuit
allowed a former spouse to qualify a posthumous order as a QDRO where the former spouse was seeking a separate
interest in a pension, rather than surviving spouse rights. See Files, 428 F.3d 478, 488. As a result, Files effectively
confined the applicability of the Samaroo rule to block only attempts to rely upon a posthumous order to obtain
surviving spouse benefits, rather than any other type of pension benefit. See id. at 487 ("[W]e conclude that Files
does not seek a survivorship benefit and that, therefore, Samaroo is not controlling."); id. at 491 ("Nothing in . . . our
precedent . . . requires that a QDRO be in place prior to the death of a plan participant when the QDRO . . . simply
seeks to enforce a separate interest in a pension benefit that existed before the death of the plan participant."
(emphasis added)).
          Files could be read to suggest that Samaroo is even more limited—that the rule of Samaroo bars a former
spouse from attempting to use a posthumous state court order to obtain benefits only if the benefits sought are
surviving spouse benefits and the original state court divorce order did not intend to award those rights. If this
reading is correct, Deborah might not be barred from seeking an amended state court order that explicitly awards her
surviving spouse rights, provided that she could establish that the original divorce decree intended to award her
those rights. In Files, the court observed that "the detailed QDRO requirements set forth in ERISA are devoid of any
requirement that a QDRO be in place before plan benefits reach pay status under the plan," see id. at 489 (citing Trs.
of Dirs. Guild of Am. Producer Pension Benefits Plans v. Tise, 234 F.3d 415, 421 (9th Cir. 2000), amended by 255
F.3d 661 (9th Cir. 2000)), and therefore concluded that "nothing in the statutory language precluded [the former
spouse] from pursuing a QDRO after [the participant's] death to enforce her previously existing fifty percent interest
in [the participant's] pension," see id. at 489. Both of those conclusions would appear to be in tension with the
reasoning of Samaroo. One way that Files attempted to distinguish the earlier case was on the ground that in
Samaroo, it was unclear whether the original divorce decree had awarded the former spouse the rights that she was
seeking posthumously, while in Files, it was clear that the former spouse was simply seeking to vindicate rights that
an earlier state court order had already granted her. See id. at 488. Read together, these passages could suggest that
the outcome in Samaroo must be attributable to the fact that the original divorce decree had not intended to award
the former spouse surviving spouse rights, and that, if it had, the result would have been different. See Jones v. W.
Va. Pub. Emps. Ret. Sys., 775 S.E.2d 483, 499 (W. Va. 2015) (interpreting Samaroo in this way); In re Marriage of
Padgett, 91 Cal. Rptr. 3d 475, 485 (Cal Ct. App. 2009) (appearing to reach this conclusion).
          The problem with this reading of Samaroo is twofold. First, while Samaroo expressed some doubt that the
original divorce decree intended to award the former spouse surviving spouse rights, see 193 F.3d at 187 n.2, 188,

The following conclusions can now be made. First, Deborah has both a separate interest in Kevin's pension and a valid QDRO under ERISA to enforce that interest (provided that the terms of the Plan did not extinguish that interest upon Kevin's death). If Deborah's separate interest was extinguished by Kevin's death, her only resort would be to seek to be treated as his surviving spouse so that she could collect the Plan's qualified preretirement survivor annuity. However, the original divorce decree most likely did not intend to award her that interest. Even if it did, the divorce decree did not explicitly mention surviving spouse rights, which means it is not sufficient under ERISA to secure her those rights. Under Samaroo, even if Deborah could persuade a state court to amend the divorce decree to explicitly award her surviving spouse rights to try to meet ERISA's specificity requirement,[15] it is too late, because a valid QDRO awarding her those benefits did not exist at the time of Kevin's death. Together, this means that Deborah has lost her chance to be treated as Kevin's surviving spouse. Deborah's ability to obtain any

---

the court expressly declined to make that determination or decide whether or not the decree could have itself qualified as a QDRO that entitled her to enforce those rights. See 193 F.3d at 187 n.2; see also Files, 428 F.3d at 488. Second, nearly all of Samaroo's reasoning focused on the problems inherent in submitting a QDRO to a pension plan after the plan had already made the determination that none existed. Meanwhile, the court paid little attention to whether or not the original divorce decree had awarded the former spouse the surviving spouse rights she sought. See Samaroo, 193 F.3d at 190 (recognizing that "successful operation of a defined benefit plan requires that the plan's liabilities be ascertainable as of particular dates"); id. (expressing concern about the "actuarial havoc" that would result if former spouses could present pension plans with claims to surviving spouse benefits after the plans had already determined that none were payable); id. at 191 (opining that allowing a divorced plan participant to retain the option to award surviving spouse benefits to a new wife up until death, only to confer those benefits upon a former spouse when the participant died without remarrying, would allow the participant to "have his cake and eat it, too"). Samaroo also relied upon a decision of the New Jersey Superior Court that refused to allow a former spouse to use a posthumous state court order to obtain surviving spouse rights despite the fact that it was "obvious" that the original divorce decree intended to confer those rights, see Ross v. Ross, 705 A.2d 784, 796 (N.J. Super. Ct. App. Div. 1998), and Samaroo appeared to endorse that court's conclusion that a former spouse can only obtain surviving spouse benefits if there "was a QDRO in place at the time of the participant's death." See 193 F.3d at 190. If this means that Samaroo and Files can only be distinguished by the fact that the former spouse in Samaroo sought surviving spouse benefits while the former spouse in Files sought a separate interest, the two are difficult to reconcile. However, any other understanding of Samaroo would appear to be difficult to justify as anything more than a historical revision.

[15]      It is far from clear that a Pennsylvania court would be willing to amend the divorce decree at this time, because under Pennsylvania law, "a trial court may not modify a divorce decree if more than thirty days has passed after the entry of the decree, in the absence of extrinsic fraud or other extraordinary causes." Stockton v. Stockton, 698 A.2d 1334, 1337 (Pa. Super. Ct. 1997).

benefits from Kevin's pension therefore depends upon whether her separate interest survived Kevin's death.

### III. The fact that Susan is currently receiving surviving spouse benefits does not prevent Deborah from obtaining her separate interest in the pension.

The remaining question is whether Deborah may have lost her opportunity to secure her separate interest in Kevin's pension because she did not notify the Plan of her interest before Kevin's death. Upon his death, Susan—Kevin's spouse at the time—became the holder of a qualified preretirement survivor's annuity, and some courts have held that surviving spouse benefits irrevocably vest in the participant's current spouse at the time the benefits become payable unless the plan had previously received a valid QDRO granting a different spouse the right to be treated as the surviving spouse. See, e.g., Carmona v. Carmona, 603 F.3d 1041, 1060 (9th Cir. 2010); Rivers v. Cent. & S. W. Corp., 186 F.3d 681, 683 (5th Cir. 1999) Hopkins v. AT & T Glob. Info. Sols. Co., 105 F.3d 153, 157 (4th Cir. 1997).[16] But see Yale-New Haven Hosp. v. Nicholls, 788 F.3d 79, 88 & n.7 (2d Cir. 2015). The Third Circuit has not yet addressed this "vesting" issue, but the court has cited to Hopkins's reasoning with approval. See

---

[16] These cases could be read narrowly to suggest that this rule is not applicable if a state court order, entered before the date on which the benefits became payable to a different spouse, had granted the former spouse the right to be treated as the surviving spouse. See, e.g., Carmona, 603 F.3d at 1060 (distinguishing a prior case on the ground that the case "established that a state court domestic relations order may be qualified even after a participant's death" if the interest was "already-existing," whereas in Carmona, the court was confronted with the question of "whether there are any restrictions as to when a state can create an enforceable interest"); see also Nicholls, 788 F.3d at 88 n.8. But because both Hopkins and Carmona relied upon concerns about "administrative convenience" and the need "for the plan administrators to know, with some finality, who the spouse is at the time that the benefits become payable" they suggest that a valid QDRO must be received by the plan prior to that time, even if an earlier state order existed that had already created that interest. See Carmona, 603 F.3d at 1059; Hopkins, 105 F.3d at 157 n.7; see also Carmona, 603 F.3d at 1060 n.13 (suggesting that an order that qualifies as a valid QDRO must be presented to the plan before the date on which the surviving spouse benefits become payable).

Even if a narrower reading is possible, it does not appear that the Third Circuit would agree. In Files, the court cited with approval to Singleton v. Singleton, 290 F. Supp. 2d 767, 771 (W.D. Ky. 2003), which held that "ERISA and Hopkins specifically require that to qualify a former spouse for the surviving spouse benefits, where there is also a current spouse, the Funds must receive a QDRO prior to the triggering event. . . . That a signed [domestic relations order] actually existed is legally irrelevant so long as the Funds did not receive an actual copy in a timely fashion." See Files, 428 F.3d 487 n.12. Because Deborah did not submit an order to the Fund prior to Kevin's death that was sufficient under ERISA to grant her survivorship benefits, this vesting rule is an additional reason why it is too late for Deborah to seek any survivorship interest in the pension.

Samaroo, 193 F.3d at 190; see also Files, 428 F.3d at 487 (distinguishing the circumstances before the court from the circumstances in Hopkins by observing that "in Hopkins, there was an attempt to divest benefits already vested in a subsequent spouse, whereas here, there was no such vesting, and therefore, no such disruption to actuarial planning.").

This vesting rule is not applicable here. Deborah is not seeking to divest Susan of her status as Kevin's surviving spouse so that she, instead of Susan, can obtain the qualified preretirement survivor annuity. Rather, Deborah is seeking to rely upon her separate interest in fifty percent of the pension in order to be treated as "an independent participant under the plan." See Turner, supra, § 6:34. If Deborah succeeds in obtaining her separate interest in the pension, that will not extinguish Susan's right to receive surviving spouse benefits from Kevin's half of the pension interest. See id. (recognizing that a participant who grants a separate interest in a portion of his or her pension to another person "remains free to elect survivor benefits payable to a future spouse"). Those courts that have adopted the vesting rule relied upon "statutory provisions and policy considerations" unique to surviving spouse rights, see Tise, 234 F.3d at 422 n.6, such as the fact that ERISA's structure suggests that surviving spouse rights vest in an identifiable person at the time the benefits become payable, see Carmona, 603 F.3d at 1057-58, that an attempt to transfer surviving spouse benefits after they had become payable may not be consistent with ERISA's "finely tuned congressional scheme," see id. at 1058, and that allowing one spouse to substitute his or her measuring life for the life of another spouse after the plan had already computed the necessary actuarial computations "would make it difficult for trustees to administer plans based on the actuarial value of both the participant and the surviving spouse," see id. at 1069. Because Deborah does not seek to substitute herself for Susan as Kevin's surviving spouse, these concerns are not implicated.

**IV.    Deborah is not estopped from seeking an interest in Kevin's pension, the doctrine of exhaustion does not apply to the Plan's request for a declaratory judgment, and the time that has lapsed since the Plan first learned of Deborah's claim does not bar her from qualifying her interest.**

Finally, Susan makes three additional arguments that require attention. First, she argued that Deborah should be judicially estopped from seeking an interest in Kevin's pension because she has also filed a malpractice action in state court against her counsel at the time of the divorce, alleging that he failed to take appropriate action to, among other things, secure her interest in Kevin's pension. Judicial estoppel bars a party from taking two positions in different litigation that are "irreconcilably inconsistent," Montrose Med. Grp. Participating Sav. Plan v. Bulger, 243 F.3d 773, 779 (3d Cir. 2001), and the positions Deborah has taken are surely inconsistent with each other. However, "[i]nconsistencies are not sanctionable unless a litigant has taken one or both positions 'in bad faith—i.e., with intent to play fast and loose with the court.'" Id. at 780-81 (quoting Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 361 (3d Cir. 1966)). The Federal Rules of Civil Procedure permit a party to plead in the alternative, see Fed. R. Civ. P. 8(a)(3), and so too may a party advance alternative claims in different suits, "so long as the initial claim was never sustained." See id. at 782. In other words, only if "a party assumes a certain position in a legal proceeding, and succeeds in maintaining that position" should the party be estopped from taking a contrary position in another suit. See id. (quoting Fleck v. KDI Sylvan Pools, Inc., 981 F.2d 107, 121 (3d Cir. 1992)).

While Deborah's malpractice action is inconsistent with her position here that the divorce decree is sufficient under federal law to award her an interest in Kevin's pension, as of this time it does not appear that she has prevailed in that action.[17] Indeed, the viability of that action (and the appropriate measure of damages to which she would be entitled) likely depends in large part

---

[17]    The parties' Stipulation of Facts does not reveal the present status of Deborah's malpractice action, but there is no indication that the action has yet been resolved.

on the outcome of this declaratory judgment action. Deborah is simply seeking to preserve her right to seek relief from her former attorney in the event that she is unable to obtain recognition for her interest in Kevin's pension. That does not require the application of judicial estoppel. See Stewart, 207 F.3d at 1164 ("The dissent suggests that because [the plaintiff] has filed a malpractice action against her divorce attorneys alleging their failure 'to prepare a "Qualified Domestic Relations Order"' that she has conceded that the Marital Dissolution Order is not a valid QDRO. [The plaintiff's] complaint in her malpractice action contains conclusory allegations having no binding effect on the resolution of the issues in this case.").

Second, Susan argues that Deborah should be barred from obtaining an interest in Kevin's pension because she did not exhaust the remedies afforded to her by the terms of the Plan. Specifically, Susan points to the fact that Deborah did not avail herself of the opportunity to appeal the Plan's initial determination that she was not entitled to an interest in Kevin's pension.[18] But while "persons claiming plan benefits must generally 'exhaust their administrative remedies before seeking judicial relief,'" Metro. Life Ins. Co. v. Price, 501 F.3d 271, 280 (3d Cir. 2007) (quoting Berger v. Edgewater Steel Co., 911 F.2d 911, 916 (3d Cir. 1990)), this declaratory judgment action was brought by the Plan to resolve uncertainties over its obligations, not by Deborah. See id. at 282 (declining to prevent a fiduciary of a life insurance plan from pursuing an action in interpleader to resolve competing claims over plan benefits prior to the plan making an initial decision on the parties' respective rights). Exhaustion would also be unlikely to serve the ends of judicial economy. Even if Deborah had prevailed through the Plan's appeals process, Susan would still be entitled to "a plenary 'second look' in federal court" of the Plan's determination of whether Deborah possessed a valid QDRO, which suggests that this

---

[18]    See Stipulation of Facts Ex. B § XI (describing the appeals procedure available under the terms of the Plan).

action would still have inevitably ended up here, just with the parties' roles reversed. See id. Accordingly, the fact that Deborah did not avail herself of the procedures afforded to her by the terms of the Plan does not bar her from benefitting from the outcome of the Plan's declaratory judgment action.

Finally, Susan argues that Deborah cannot enforce any interest she may have in the pension because she did not manage to qualify a state court order as a QDRO within eighteen months of the date that the Plan was first notified of her potential interest. Susan is referring to the fact that "the statutory QDRO requirements expressly contemplate a 'qualification' process by which plans, once on notice of a state court DRO, will determine whether a state court DRO is sufficient to alter existing plan obligations." Files, 428 F.3d at 489. Under § 1056(d)(3)(H)(ii), "[d]uring any period in which the issue of whether a domestic relations order is a qualified domestic relations order is being determined . . . the plan administrator shall separately account for the amounts . . . which would have been payable to the alternate payee during such period if the order had been determined to be a qualified domestic relations order." The statute further provides that if the question of whether the state court order qualifies as a QDRO has not been resolved within eighteen months of "the date on which the first payment would be required to be made under the [state court] order," then the plan administrator must pay the amounts that were segregated to the person who would have been entitled to them had the competing state court order not been brought to the plan's attention. See id. § 1056(d)(3)(H)(iii), (v). But if the eighteen-month period draws to a close before it is determined whether a state court order qualifies as a QDRO, that does not mean that the person seeking to qualify the order has lost their opportunity to do so. Rather, the order may be qualified after that time, but "[a]ny determination that an order is a qualified domestic relations order which is made after the close

of the 18-month period . . . shall be applied prospectively only." Id. § 1056(d)(3)(H)(iv). Thus, the fact that Deborah was not able to qualify the divorce decree as a QDRO until more than eighteen months after the Plan received notice of her interest does not mean that her window of opportunity has closed; rather, the only effect may be that her interest could only be applied prospectively. See Files, 428 F.3d at 490 ("It is only after this eighteen-month period has expired that the putative alternate payee loses the right to uphold payment of plan proceeds to a designated beneficiary. And even then, if the DRO ultimately is 'qualified' as a QDRO, the obligations thereunder shall be applied prospectively." (citation omitted)).

Moreover, it is not clear that the eighteen-month period has ended. Susan argues that the eighteen-month period began when the Plan received notice of Deborah's claim to an interest in Kevin's pension. However, the statute provides that the eighteen-month period begins "with the date on which the first payment would be required to be made under the [competing] domestic relations order," not the date on which the Plan receives notice of the competing order. See 29 U.S.C. § 1056(d)(3)(H)(v); QDROs, supra, at 20 ("This '18-month period' does not begin until the first date (after the plan receives the order) that the order would require payment to the alternate payee.").[19] As the Court has previously discussed, as a separate interest holder in Kevin's pension, Deborah would not be able to begin receiving benefits until the date that Kevin would have reached the minimum retirement age. The parties have not briefed the question of what the applicable minimum retirement age would be for a person possessing a separate interest in Kevin's pension, and since that determination would require an interpretation of the terms of the Plan, the Plan administrator shall have the opportunity to make that determination at first

---

[19]     See also The 401(k) Handbook ¶ 270 (Martha Priddy Patterson ed.), Westlaw (October 2014) ("The 18-month period begins on the date that the first payment would have to be made under the order, if it were qualified. If, at the time the order is received, nothing is immediately payable to the alternate payee, the period does not begin on the date that the order is received by the plan administrator. Instead, it begins on the first date after the order is received that amounts would be paid to the alternate payee.").

instance. For the present purposes, it is sufficient to observe that eighteen months may not yet have passed from "the date on which the first payment would be required to be made" to Deborah (assuming that her separate interest was not extinguished by Kevin's death).

**V.      Conclusion**

The divorce decree awarded Deborah a separate interest in fifty percent of Kevin's pension. The divorce decree qualifies as a QDRO under ERISA, which means that Deborah can enforce that interest, and the fact that Susan is currently receiving surviving spouse benefits does not prevent Deborah from obtaining that interest. However, it is possible that Deborah's separate interest was extinguished when Kevin died, but that depends upon the terms of the Plan, and the Plan administrator must make that initial determination at first instance.

The divorce decree likely did not intend to award Deborah the right to be treated as Kevin's surviving spouse for the purpose of the qualified preretirement survivor annuity that Susan is currently receiving, and even if it did, the divorce decree is not sufficiently specific under ERISA to allow Deborah to enforce that right. Under the law of this circuit, it is too late for Deborah to attempt to obtain an amended order from a state court explicitly awarding her that right, even if a state court is willing to issue one. Accordingly, if her separate interest lapsed with Kevin's death, Deborah cannot obtain an interest in the survivor annuity.

A separate order entering an appropriate declaratory judgment follows.

BY THE COURT

*/s/ Joseph F. Leeson, Jr.*_____
JOSEPH F. LEESON, JR.
United States District Judge

21